UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------   X
                                                                       :
TIMOTHY BURKS,                                                         :        17-cv-00177 (ARR) (RLM)
                              Plaintiff,                               :
                                                                       :        OPINION & ORDER
          -against-                                                    :
                                                                       :
THE CITY OF NEW YORK, *et al.*,                                        :
                                                                       :
                              Defendants.                              :
-------------------------------------------------------------------   X

ROSS, United States District Judge:

          Plaintiff, Timothy Burks, brings this civil rights action under 42 U.S.C. § 1983 and New

York state law against the City of New York, Detective Ayinde McBurnie, Detective Peter

Thompson, Jr., Sergeant Brandon Bersch, and several unnamed employees of the Department of

Corrections (collectively, "defendants"). His claims arise out of his October 14, 2015 arrest and

subsequent remand to Rikers Island, where he received treatment for an injury to his hand and was

prescribed three medications following an intake appointment with a registered physician's

assistant. Defendants have moved for partial summary judgment on three of the claims in

plaintiff's amended complaint: (1) his assertion that Detective McBurnie failed to intervene to

prevent Detective Thompson's use of excessive force during plaintiff's arrest, (2) his assertion that

defendants were negligent in providing medical treatment to address plaintiff's mental health

needs, and (3) his assertion that Sergeant Bersch is liable in a supervisory capacity for the violation

of plaintiff's constitutional rights. For the reasons that follow, I grant defendants' motion for

summary judgment on the failure to intervene and supervisory liability claims, and I dismiss the

negligence claim as I find that it does not share a "common nucleus of operative fact" with

plaintiff's remaining federal claim.

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, all material facts are undisputed.

### I.    Plaintiff's Arrest

On October 14, 2015, Timothy Burks ("plaintiff") was arrested by two NYPD detectives, Ayinde McBurnie and Peter Thompson, Jr. *See* Defs.' 56.1 ¶¶ 1, 3, 7, ECF No. 44; Pl.'s 56.1 Resp. ¶¶ 1, 3, 7, ECF No. 48. The arrest was conducted pursuant to a valid arrest warrant issued by a judge in Kings County Supreme Court on an unrelated matter. *See* Defs.' 56.1 ¶ 9; Pl.'s 56.1 Resp. ¶ 9.

Though plaintiff eventually complied with the officers' orders and allowed himself to be handcuffed and transported to court, he initially ran and tried to hide when the officers first approached him on Linden Boulevard in Brooklyn. *See* Pl.'s Counter 56.1 ¶¶ 1, 3–4, ECF No. 48; Saavedra Decl., Ex. B ("Burks Dep."), at 17:03–19:12, ECF No. 46-2.[1] Plaintiff testified that he did not know that the men were police officers, and he feared that they intended to rob him when one of the men exited an unmarked white van and yelled his name. Pls.' Counter 56.1 ¶¶ 2–3; Burks Dep. 17:03–19:12. About three minutes after they arrived, McBurnie and Thompson caught up with plaintiff outside of a building located at 300 Linden Boulevard. *See* Pl.'s Counter 56.1 ¶¶ 2, 5–6; Defs.' 56.1 ¶¶ 2, 5; Burks Dep. 21:18–20. At this point, the detectives announced that they were police officers, and McBurnie placed plaintiff in handcuffs behind his back. Defs.' 56.1 ¶¶ 5, 6; Pl.'s 56.1 Resp. ¶¶ 5–6; Pl.'s Counter 56.1 ¶ 5.

After he was handcuffed, plaintiff asserts that Thompson—who was standing next to

---

[1] Defendants argue that these facts are "not material to defendant's summary judgment motion," though they do not cite to any evidence in the record that contradicts this sequence of events. Defs.' Resp. to Pls.' 56.1 ¶¶ 1, 3, ECF No. 51. I include these facts here because I find that they are relevant to the statement plaintiff alleges that Detective Thompson made in the course of the arrest. That statement, in turn, is relevant to plaintiff's failure to intervene claim, and thus these facts are material to the instant motion.

McBurnie during the arrest—turned to him and said, "[T]hat's what you get from running from me." Burks Dep. 24:09–11. Thompson then proceeded to "grab[] plaintiff by his shirt and thr[o]w plaintiff to the ground on his back." Defs.' 56.1 ¶ 6; Pl.'s 56.1 Resp. ¶ 6. Though it is undisputed that Thompson threw plaintiff to the ground after he was handcuffed, defendants asserted in their 56.1 statement that the throw occurred "without warning." Defs.' 56.1 ¶ 7. However, they do not dispute that plaintiff testified that Thompson said something to the effect of "this is what you get for running from me" before he threw plaintiff to the ground, and they do not cite to any conflicting testimony from the other defendants regarding the statement made by Thompson. Defs.' Resp. to Pl.'s Counter 56.1 ¶ 8, ECF No. 51; *see also* Burks Dep. 24:09–11. The push caused plaintiff to fall backwards onto his hands, which were rear-cuffed behind him. Defs.' 56.1 ¶ 8; Pl.'s 56.1 Resp. ¶ 8. As a result, he injured his left hand. *Id.*

The record does not contain specific information about how much time passed between Thompson's statement and the throw that resulted in plaintiff's hand injury, but plaintiff testified that it was only a "matter of seconds" between when McBurnie put him in handcuffs and when he was thrown to the ground. Burks Dep. 26:03. It is also undisputed that Thompson's statement was made "*after* [plaintiff was] placed in handcuffs," *Id.* at 24:09–13 (emphasis added); *see also* Defs.' 56.1 ¶ 5–6; Pl.'s 56.1 Resp. ¶ 5–6. Plaintiff testified that he received no warning that he was about to be thrown to the ground, "other than [Thompson's statement that] this is what you get from running from us." Burks Dep. 26:04–07. Both parties agree that Thompson and McBurnie were the only defendants present for the arrest and for plaintiff's injury. Defs.' 56.1 ¶¶ 3–4; Pl.'s 56.1 Resp. ¶¶ 3–4; Burks Dep. 27:18–20. However, plaintiff "notes for the record . . . that defendant Bersch testified that he was present for plaintiff's arrest." Pl.'s 56.1 Resp. ¶¶ 3–4; *see also* Klein Decl., Ex. 1 ("Bersch Dep.") at 50:23–51:25, ECF No. 49-1.

After the arrest, plaintiff was "transported to criminal court where he was brought before the Judge who issued the arrest warrant and was remanded to Rikers Island." Defs.' 56.1 ¶ 9; Pl.'s 56.1 Resp. ¶ 9. The parties dispute whether plaintiff complained of pain in his left hand after the fall, and whether he asked the arresting officers if he could receive medical treatment upon arriving at the courthouse. *See* Pl.'s Counter 56.1 ¶¶ 18–19; Burks Dep. 28:02–05; Bersch Dep. 58:05–09; *cf.* Defs.' Resp. to Pl.'s Counter 56.1 ¶¶ 18–19 (arguing that this fact is immaterial to the instant motion). In any event, both parties agree that a "Court Action Sheet" that summarized plaintiff's appearance before the criminal court judge included the notation "psych attn. & med. attn," Pl.'s Counter 56.1 ¶ 20; Defs.' Resp. to Pl.'s Counter 56.1 ¶ 20; Klein Decl., Ex. 10 ("Record of Court Action") at D75, ECF No. 49-10, though they dispute whether this notation can properly be characterized as a "court order," *id.* After the court appearance, plaintiff was brought to Rikers Island, where he was processed through medical intake. Defs.' 56.1 ¶ 10; Pl.'s 56.1 Resp. ¶ 10.

## II.    Rikers Island Medical Treatment

After arriving at Rikers, plaintiff met with Rose Anim, a Registered Physician's Assistant, early in the morning of October 15, 2015. *See id.*; *see also* Saavedra Decl., Ex. C ("Medical Records") at D20–26, ECF No. 46-3. Ms. Anim memorialized her visit with plaintiff in a medical intake form. Medical Records at D20–26. She noted that plaintiff had a history of depression and schizophrenia and that his mental health condition had previously resulted in hospitalization. Medical Records at D20.[2] In the "Community Medication Fill History" section of the intake form, she confirmed that she checked the "community medication fill database" and listed plaintiff's current medications as Olanzapine, Valproic Acid, Sumatriptan, and Topiramate. *Id.* at D21.

---

[2] Neither party objects to the court's consideration of these medical records in the instant motion, and the medical records are accompanied by a certification from Marella Lowe, the Assistant Director of Medical Records for New York City Correctional Health Services. *See* Saavedra Decl., Ex. C at D2, ECF No. 46-3.

Defendants dispute the relevance and meaning of this section of the intake form, and they note that the same form includes a notation on the first page that lists plaintiff's "current medications" as "none." Defs.' Resp. to Pl.'s Counter 56.1 ¶ 24. They argue that the conflicting information leads to a lack of clarity regarding whether "plaintiff was . . . treating his mental health issues with Olanzepine" at the time of his incarceration. *Id.*[3]

In the "Treatment" section at the end of the intake form, Ms Anim prescribed the following medications: Depakote, Omeprazole, and Ibuprofen. Medical Records at D24. It is undisputed that Ms. Anim did not prescribe plaintiff Olanzepine, which is more commonly known as Zyprexa. Pl.'s Counter 56.1 ¶¶ 24–26; Defs.' Resp. to Pl.'s Counter 56.1 ¶¶ 24–26. However, the parties dispute which of plaintiff's medical conditions the three medications (Depakote, Omeprazole, and Ibuprofen) were intended to treat and, in particular, whether any of these medications can be considered "mental health medications." *Id.* Ms. Anim referred plaintiff for "diagnostic imaging" of his left hand and recommended that he receive a mental health evaluation. Medical Records at D24. Plaintiff's medical records reveal that he met with Cerissa Vultaggio, a licensed mental health counselor, and Peter Wachtel, a doctor of osteopathic medication, later that day. Medical Records at D12–19. By the end of October 15, 2015, "plaintiff had received an X-ray of his left hand, received pain medication for [] the pain to his left hand, and received a soft cast." Defs.' 56.1 ¶ 14; Pl.'s 56.1 Resp. ¶ 14.

During plaintiff's mental health intake with Ms. Vultaggio, he recounted a history of "depressed mood/mood swings." Medical Records at D14. Plaintiff told Ms. Vultaggio that he had engaged in self-harming behavior while incarcerated on two previous occasions: first, in 2008, he

---

[3] Plaintiff testified in his deposition that he currently treats his depression with Depakote, a medication that is also used to treat his seizure disorder, but at the time of his arrest he was taking another medication for depression. Burks Dep. 45:06–17.

"attempted to stab [him]self in the neck," and later, in 2011, "he attempted to cut his wrist." *Id.* at D14–15. She further noted that plaintiff reported that he participated in mental health treatment at Kingsboro prior to his incarceration, and that he had a prescription for Zyprexa. *Id.* at D14. The parties dispute whether Ms. Vultaggio "verified" these facts, but they agree that Ms. Vultaggio wrote in the intake form that plaintiff self-reported this information to her. *See* Pl.'s Counter 56.1 ¶ 28; Defs.' Resp. to Pl.'s Counter 56.1 ¶ 28. In the "past psychiatric history" section of the form, Ms. Vultaggio listed plaintiff's current psychiatric medication as "Zyprexa – as per [patient's] report and Community Medication Fill [History]." Medical Records at D15. Despite previously noting that plaintiff "reports a h/o [of] self harm" *id*., Ms. Vultaggio wrote in the "risk assessment" section that plaintiff has "[n]o h/o [of] self harm." *Id.* at D18. On that same page, however, she also wrote that plaintiff "reports a h/o self harm x 2 both while incarcerated." *Id.* She concluded that, "without continued [mental health treatment] and medication," plaintiff would "decompensate," struggle to maintain "self-care, activities of daily living, [and] social functioning . . . and he would fail to complete task[s] without direction and monitoring." *Id.* at D16.

Ms. Vultaggio recommended that plaintiff be placed in the general population at Rikers and that he receive "[mental health] follow up [with a] Clinician/Psychiatrist." *Id.* at D19. Plaintiff asserts that this notation indicates that Ms. Vultaggio intended a follow-up appointment with a clinician or psychiatrist to be a "specific[] condition[]" of her recommendation that plaintiff was fit for the general population. Pl.'s Counter 56.1 ¶ 35. Defendants do not dispute that Ms. Vultaggio recommended follow-up treatment, but they argue that there is nothing in the record to indicate that Ms. Vultaggio's recommendation for further mental health treatment was in any way related to her recommendation regarding plaintiff's housing placement. Defs.' Resp. to Pl.'s Counter 56.1 ¶ 35. Both parties agree, however, that plaintiff did not receive a follow-up visit with a clinician

or psychiatrist, and that he did not receive a prescription for Zyprexa during his remaining time at Rikers. Pl.'s Counter 56.1 ¶ 39; Defs.' Resp. to Pl.'s Counter 56.1 ¶ 39.

On October 20, 2015, plaintiff filed a grievance form with the Department of Corrections regarding his mental health treatment. Pl.'s Counter 56.1 ¶ 40; Defs.' Resp. to Pl.'s Counter 56.1 ¶ 40. He was discharged from Rikers the following day. Defs.' 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18. Plaintiff testified that he experienced increased depression and a lack of interest in socialization during his time at Rikers, both of which he alleges were caused by defendants' failure to provide appropriate psychiatric support. *See* Burks Dep. 48:02–16. He argues that the failure to provide him with a Zyprexa prescription and the failure to schedule a follow-up appointment with a psychiatrist or clinician resulted in a breach of the State's duty to provide its incarcerated citizens adequate medical treatment. *See* Pl.'s Opp'n 7–8, ECF No. 47. He also argues that the conflicting information on his mental health intake form, which recounted his self-reported history of self-harm while also including a separate notation that he had "no h/o self-harm," Medical Records at D 18, constituted negligence, as it led to defendants' alleged inappropriate decision to place plaintiff in general population housing. Pl.'s Opp'n 4.

Plaintiff initiated this lawsuit on January 12, 2017. *See* Compl., ECF No. 1. He subsequently amended his complaint on October 12, 2017, Am. Compl., ECF No. 13, and asserted federal claims of excessive force, deliberate indifference to serious medical needs, failure to intervene, supervisory liability, and municipal liability. *Id.* ¶¶ 37–61. He also brought state claims for assault, battery, and negligence. *Id.* ¶¶ 62–81. Following defendants' submission of a pre-motion letter informing the court that they intended to file a motion for partial summary judgment on several of plaintiff's claims, plaintiff voluntarily dismissed his claims for municipal liability and deliberate indifference to serious medical needs. *See* Stip. of Voluntary Dismissal, ECF No.

37. In the instant motion, defendants move for summary judgment on plaintiff's negligence, failure to intervene, and supervisory liability claims.[4] *See* Defs.' Mem., ECF No. 45.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). At the summary judgment stage, the court's role is not to resolve disputed issues, but rather to determine whether a genuine issue exists that must be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "A dispute is genuine if the evidence could permit a reasonable jury to reach a verdict on either side." *Aetna Cas. & Ins. Co. v. U.S.*, 685 F. Supp. 334, 336 (E.D.N.Y. 1988). Materiality, on the other hand, "runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing *Anderson*, 447 U.S. at 248). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and carries the burden of demonstrating that there are no genuine disputes regarding material facts, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

The court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). To overcome a motion for summary judgment, the adverse party "must set forth specific facts showing that there is a genuine issue for

---

[4] Though plaintiff initially told the court that he intended to voluntarily dismiss his claims for supervisory liability, deliberate indifference to serious medical needs, and municipal liability, *see* Pl.'s Opp'n to Pre-Motion Conference 2, ECF No. 32, the stipulation of dismissal filed on August 2, 2018 did not dismiss the supervisory liability claim, Stip. of Voluntary Dismissal, ECF No. 36. Nevertheless, plaintiff now asserts that he does not dispute plaintiff's motion for summary judgment on the supervisory liability claim, so the claim is accordingly dismissed. *See infra* Discussion Pt. I.

trial." *Anderson*, 447 U.S. at 248. If the non-moving party fails to provide any "proof concerning an essential element of the nonmoving party's case," the moving party is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323. In other words, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

## DISCUSSION

### I. Defendant's motion for summary judgment on the supervisory liability claim is granted.

Plaintiff's amended complaint includes a claim for supervisory liability against Sergeant Bersch and the John and Jane Doe defendants who are supervisory employees of the Department of Corrections. *See* Am. Compl. ¶¶ 49–51. Under 42 U.S.C. § 1983, a defendant can be held liable for a constitutional deprivation only if he was personally involved in the violation. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Defendants argue that "there is nothing in the record to suggest that Sgt. Bersch was aware that his subordinates planned to use excessive force on plaintiff." Defs.' Mem. 7. As this would be the only way to find defendant Bersch liable for the violation of plaintiff's constitutional rights, and as it is undisputed that the Department of Corrections defendants were not present at the time of the arrest, they argue that they are entitled to summary judgment on the supervisory liability claim. *Id.* at 8.[5]

Plaintiff does not contest this portion of defendants' motion, Pl.'s Opp'n 1 n.1, and plaintiff himself testified that Bersch was not present during his arrest or at the time of the push that led to

---

[5] Plaintiff's amended complaint initially included a federal claim for deliberate indifference to plaintiff's serious medical needs, which would have allowed plaintiff to argue that the John and Jane Doe Department of Corrections supervisors were liable for this constitutional violation. However, plaintiff subsequently voluntarily dismissed that claim, leaving the excessive force claim as plaintiff's sole remaining constitutional claim.

his hand injury. *See* Pl.'s 56.1 Resp. ¶ 3–4. Accordingly, plaintiff's supervisory liability claim is dismissed.[6]

## II. Defendants' motion for summary judgment on the failure to intervene claim is granted.

Plaintiff seeks to hold Detective McBurnie liable for failing to intervene when Detective Thompson pushed plaintiff to the ground after he was handcuffed. *See* Pl.'s Opp'n 5–7. Plaintiff asserts that Thompson provided a warning that he was about to harm plaintiff when he "stated in sum and substance, this is what happens to people who run." *Id.* He argues that this warning put McBurnie on notice that Thompson planned to violate plaintiff's constitutional rights, and that McBurnie's failure to stop Thompson makes him liable for the resulting violation. *Id.*

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). As such, an officer who "observes or has reason to know" that another officer is using excessive force can be held liable for failing to intercede to stop the constitutional violation from occurring. *Id.* However, liability will not attach simply because another officer is present at the time of a violation; instead, the plaintiff must be able to establish that the officer was "*personally* involved in the use of excessive force" because he was aware of the use of force and had an opportunity to prevent it. *Corley v. Shahid*, 89 F. Supp. 3d 518, 523 (E.D.N.Y. 2015) (emphasis added) (collecting cases); *see also Merrill v. Schell*, 279 F. Supp. 3d 438, 444 (W.D.N.Y. 2017) ("Whether an officer had a realistic opportunity to intervene depends on several factors, including the number of officers present, their proximity to the situation, the environment in which they acted, the nature of the

---

[6] Plaintiff also "does not contest" defendants' motion for summary judgment on the failure to intervene claim against Sergeant Bersch, as plaintiff testified that Bersch was not present during the arrest. *See* Pl.'s Opp'n 5–6. Thus, as all claims against defendant Bersch are dismissed, he is dismissed from the case.

assault, and, often most important, the assault's duration." (citing *Figueroa v. Mazza*, 825 F.3d 89,

106 (2d Cir. 2016))). While the duration of the assault "will always be relevant and will frequently

assume great importance" in the analysis, there is no "hard-and-fast temporal cutoff" that

determines the availability of a failure to intervene claim in any given circumstance. *Figueroa*,

825 F.3d at 107. Instead, the court must "evaluate each case on its own facts" to determine whether

an officer could have intervened and yet failed to do so. *Id.*

Defendants argue that the alleged use of force against plaintiff "was instantaneous and

without warning, thereby foreclosing any realistic opportunity for Det. [McBurnie] to intervene."

Defs.' Mem. 6.[7] In response, plaintiff argues that Detective Thompson's threatening statement—

just before he proceeded to grab plaintiff by the shirt and slam him to the ground—functioned as

a warning that he intended to harm plaintiff, which gave McBurnie an opportunity to intervene

and stop Thompson from pushing plaintiff. While I agree with plaintiff that the statement made by

Thompson could have served as a warning that "Thompson was about to retaliate against plaintiff

for running," Pl.'s Opp'n 6, I disagree that a jury could find that McBurnie had a sufficient

opportunity to intervene after the statement and before the push. Thus, while the evidence—viewed

in the light most favorable to plaintiff, as the non-movant—could allow a reasonable juror to find

that McBurnie became aware that Thompson was about to violate plaintiff's constitutional rights,

the undisputed evidence in the record indicates that he did not have a reasonable opportunity to act

---

[7] In their memorandum in support of their summary judgment motion, defendants write that Detective Thompson, rather than Detective McBurnie, did not have an opportunity to intervene to prevent the violation of plaintiff's constitutional rights. Defs.' Mem. 6. However, both parties agree that it was Detective Thompson who allegedly threw plaintiff to the ground, and that Detective McBurnie was present during the arrest and saw the assault occur. *See* Defs.' 56.1 ¶ 7; Pl.'s 56.1 Resp. ¶ 7. Thus, I assume that this is a typographical error, and that defendants are instead arguing that McBurnie had no opportunity to respond, in part because of the brief duration of the alleged use of excessive force. *See* Defs.' Mem. 6 (arguing that plaintiff's failure to intervene "claim against Detective McBurnie fails because the record makes clear that the use of force was instantaneous and without warning").

before Thompson pushed plaintiff to the ground.

It is well-established that an officer is not liable for failing to intervene if the use of force is "sudden and brief." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 428 n.9 (N.D.N.Y. 2009). In *O'Neill v. Krzeminski*, for example, the Second Circuit held that an officer could not be held liable for failing to intervene in a beating because "the three blows were struck in such rapid succession that [the defendant] had no realistic opportunity to attempt to prevent them." 839 F.2d 9, 11 (2d Cir. 1988). The court held that the beating was too short "to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator." *Id.* at 11–12; *see also Gonzalez v. Waterbury*, 199 F. Supp. 3d 616, 623 (D. Conn. 2016) ("Often it is impossible for an officer to have a reasonable opportunity to intervene if the alleged used of force was quick and isolated." (citing *Haralambous v. Hubbs*, No. 3:13CV1916 (JCH), 2015 WL 3444328, at *5 (D. Conn. May 28, 2015)); *Sash v. United States*, 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (finding that the defendant was not liable for failing to intervene where the other officers "rushed up to [plaintiff], tackled him to the ground where he was held for five seconds, and then threw him against a metal wall, and the entire incident took less than thirty seconds").

Here, plaintiff testified that it was only "a matter of seconds" between when he was placed in handcuffs and when he was thrown to the ground. Burks Dep. 26:03. He also testified that Thompson said "that's what you get from running from me" *after* plaintiff was in handcuffs. *Id.* at 24:09–13. Plaintiff acknowledged that Thompson's statement was the only warning he received that Thompson intended to throw plaintiff to the ground; he did not suggest that Thompson waited for any meaningful length of time after he made the statement but before he grabbed plaintiff by the shirt. *Id.* at 26:04–07. Finally, plaintiff testified that after he was thrown, he was picked up off the ground by the same officer who had pushed him, and he was brought to the van. *Id.* at 27:10–

17. He does not suggest that either defendant used force against him after the single push that led to his hand injury. *Id.*

Taken as a whole, plaintiff's testimony demonstrates that Thompson's use of force constituted a single incident of abuse, rather than an extended sequence of events during which a bystander could have intervened and prevented further harm. *Cf. Gonzalez*, 199 F. Supp. 3d at 623 ("When a victim is subject to multiple incidents of abuse, however, the likelihood that an officer would be able to intervene is greater." (citing *O'Neill*, 839 F.2d at 11)). Moreover, the record clearly demonstrates that the incident was limited in duration; this is not a situation, as in *Figueroa*, where the parties provided conflicting information regarding the length of the assault, and where the answer to the critical question of whether the defendant had an opportunity to intervene depends on whose testimony is credited. *See* 825 F.3d at 106–07 (noting that the assault could have consisted of anywhere from five to twelve punches, and that it could have been as short as twenty seconds or as long as two minutes). Instead, plaintiff himself testified that the incident was brief, and that Thompson's statement preceding the push was his only warning that he was about to get pushed to the ground. Just as plaintiff had limited warning that a constitutional violation was about to occur, Detective McBurnie had no more than "a matter of seconds," at the most, to process that Thompson intended to harm plaintiff; before he could do anything to intervene, plaintiff had fallen to the ground from a single use of force.

Admittedly, Thompson's verbal statement before he threw plaintiff to the ground sets this case apart from the many others where a single instance of physical violence was *not* preceded by a verbal warning that the defendant intended to use force against the plaintiff. *See, e.g. Cuellar v. Love*, No. 11-cv-3632 (NSR), 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014) (holding that no reasonable jury could find that the defendant "had a realistic opportunity to prevent [the officer]

from suddenly bashing Plaintiff's face into the ground"). However, even if the use of force here was not completely sudden, the mere fact that Thompson made a statement that could have been interpreted as an indication of his intent to use force does not demonstrate that there was sufficient time for McBurnie to stop him. In fact, all of the evidence in the record confirms that Thompson's statement *immediately* preceded his use of force. The nearly instantaneous sequence of events—from the handcuffing to the warning to the push—bears some similarity to the facts of *Parks v. Segar*, where the court found that there was insufficient evidence in the record to find that the defendant officer had an opportunity to intervene and stop a dog from attacking and biting the plaintiff. No. 3:09CV1162 (HBF), 2012 WL 4051833, at *3–4 (D. Conn. Sept. 13, 2012). In that case, the plaintiff testified that another officer gave a command that "caused the dog to lurch out and bite him for half a second to a second." *Id.* at *4 (quotation omitted). The officer's command—if overheard by the defendant officer—could have functioned as a warning that an injury was about to occur, just as Thompson's threatening statement could have been interpreted as a sign that he would soon use force against plaintiff. However, the court found that the undisputed evidence was insufficient to allow a jury to find that the defendant "was able to prevent a dog bite lasting one second once the command was given." *Id.*, at *4. Furthermore, just as in the instant case where there is nothing in the record to suggest that Thompson waited between making his statement and grabbing plaintiff, the court in *Parks* noted that "neither party alleges that the time it took for the dog to react to the command was of any significant duration." *Id.* at *4 n.6.

The facts of plaintiff's arrest are not entirely like those in *Parks*; for one thing, Detective McBurnie—who had placed plaintiff in handcuffs mere seconds before plaintiff was pushed to the ground—appears to have been very close to both plaintiff and Detective Thompson at the time that the force occurred, and not, as in *Parks*, two feet away, *id.* at *4. However, *Parks* demonstrates

that an officer does not become liable for failing to intervene just because he has *some* notice—verbal or otherwise—that another officer intends to use force against the plaintiff. Indeed, even where a defendant uses force multiple times—as in *O'Neill*, where the defendant struck the plaintiff "three times in rapid succession"—an observer is not liable unless there is evidence that he could have intervened. 839 F.2d at 10, 11–12.

In other words, the central inquiry is not only whether the defendant had *notice* of an impending constitutional violation but, rather, whether that notice provided him with the time, ability, and opportunity to do something before the violation had already occurred. The uncontroverted evidence in this case demonstrates that Detective McBurnie did not have the opportunity to act during the brief period of time—less than a "matter of seconds"—between the warning statement and the push.[8] As such, defendants' motion for summary judgment on the failure to intervene claim against Detective McBurnie is granted.

### III. Because plaintiff's negligence claim does not share a "common nucleus of operative fact" with the remaining federal claim, it is dismissed for lack of jurisdiction.

Plaintiff's negligence claim arises out of the mental health treatment he received while incarcerated at Rikers from October 15 through October 21; he asserts that defendants breached their duty to provide him with adequate psychiatric care when they "place[d] plaintiff in general population and fail[ed] to provide plaintiff with psych medication or any follow-up care with a clinician or psychiatrist during the seven days he was in custody." Pl.'s Opp'n 10. Though plaintiff also asserts that he complained to defendants about the pain he was experiencing in his left hand

---

[8] As defendants demonstrate in their reply brief, the fact that the record is not clear about *exactly* how much time passed between the warning and the push does not alter this analysis. *See* Defs.' Reply 3, ECF No. 50 (citing *Johnson v. City of New York*, No. 05 Civ. 7519 (PKC), 2008 U.S. Dist. LEXIS 78984, at *14–16 (S.D.N.Y. Sept. 29, 2008), in which the court granted summary judgment to defendants on the failure to intervene claim where the plaintiff asserted that the use of force lasted for "a couple of seconds").

several hours before he saw a doctor, *see id.* at 2, he does not argue that defendants negligently provided treatment to his hand. Moreover, as defendants note, even if plaintiff did argue that defendants were liable for "a purported delay in treatment to his left hand," he has provided no evidence to suggest that any delay in treatment caused further injury to his hand beyond the harm caused by the initial use of force. *See* Defs.' Mem. 11 n.6.

I need not decide whether the evidence in the record raises a genuine issue of material fact regarding the adequacy of plaintiff's psychiatric treatment at Rikers. Instead, I agree with defendants' second argument for dismissal of the claim—that the court does not have jurisdiction over this state-law claim, because it does not share a "common nucleus of operative fact" with plaintiff's federal claim. *See* Defs.' Mem. 11–12.[9] As defendants note, a federal court's exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367(a), which provides that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The Second Circuit has "held that disputes are part of the 'same case or controversy' within § 1367 when they 'derive from a common nucleus of operative fact.'" *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (quoting *Promisel v. First Am. Artificial Flowers Inc.*, 943 F.2d 251, 254 (2d Cir. 1991)). "[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte*." *LaChapelle v. Torres*, 37 F. Supp. 3d 672, 680 (S.D.N.Y. 2014) (quoting *Lussier*, 211 F.3d at 700 (alteration in original)). Though § 1367(c) provides district courts with

---

[9] Defendants argue that I should dismiss the claim for lack of jurisdiction "[a]ssuming, *arguendo*, plaintiff has created a triable issue of fact with respect to his negligence claim." Defs.' Mem. 11. However, because I find that the court does not have jurisdiction over the negligence claim in the first place, I do not evaluate the merits of the claim at all. *See, e.g.*, *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700–01 ("If subject matter jurisdiction is lacking, the action must be dismissed.").

the discretion to *decline* to exercise supplemental jurisdiction in several circumstances, this discretionary approach applies only if it has been determined that a claim fits within § 1367(a). *See, e.g.*, *Lussier*, 211 F.3d at 704 ("While the exercise of pendent jurisdiction is a favored and normal course of action, such exercise, as noted, requires a common nucleus of operative fact." (internal citation omitted)); *Diversified Carting, Inc. v. City of New York*, 423 F. Supp. 2d 85, 99 (S.D.N.Y. 2005) ("Where a state claim is part of the same case or controversy as a sustained federal claim, the exercise of supplemental jurisdiction is within the discretion of a district court." (citing *First Capital Asset Mtmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004))).

There is no allegation here that the parties are diverse from one another; instead, original jurisdiction is premised on plaintiff's excessive force claim, which is based on Detective Thompson's use of force during plaintiff's arrest on October 14, 2015. Plaintiff's state-law negligence claim, on the other hand, is based on events that occurred from October 15 through October 21 at Rikers; it involves entirely different defendants from the officers who were present at the time of plaintiff's arrest. At the same time, the two claims are *connected* in a very broad sense; the facts underlying the negligence claim occurred only because plaintiff was at Rikers, and plaintiff was at Rikers only because he was arrested by the officers. Still, courts in the Second Circuit have held that more than a "loose factual connection" is necessary to satisfy § 1367. *See, e.g.*, *LaChapelle*, 37 F. Supp. 3d at 680 (citing cases). Though the two claims need not "turn on precisely the same historical events," the facts underlying the two claims must either "substantially overlap," or the "presentation of the federal claim [must] necessarily [bring] the facts underlying the state claim before the court." *BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 10 (S.D.N.Y. 2012) (quoting *Lussier*, 211 F.3d at 704).

Notwithstanding the general sequence of events that connects the two claims here,

plaintiff's excessive force and negligence claims ultimately rest on essentially unrelated facts. The excessive force claim centers on the events preceding plaintiff's arrest, including his attempts to run from the officers and Detective Thompson's actions before plaintiff was brought back to the van and transported to court. In contrast, the negligence claim centers on the knowledge, awareness, and intentions of Rikers medical staff when they completed plaintiff's intake forms, made his housing disposition, and prescribed him medication. The negligence claim turns on the testimony and records of medical professionals, while the excessive force claim depends on the beliefs and expectations of a reasonable officer. Though the mere fact that the claims involve different defendants does not defeat supplemental jurisdiction, *see, e.g.*, *Achtman*, 464 F.3d at 335, the location, time period, and overall circumstances of the two claims will be relevant to their similarity and whether they are part of the same "case or controversy." *Cf. Kegun Chen v. Oceanica Chinese Rest., Inc.*, No. 13-CV-4623 (NGG) (PK), 2018 WL 3973004, at *3 (E.D.N.Y. Aug. 20, 2018); *see also Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033 (2d Cir. 1979) (finding a lack of supplemental jurisdiction where the facts underlying the state-law claim occurred *after* the elements of the federal claim were all in place). Here, as in *LaChapelle*, the court's consideration of the state-law negligence claim would require it to engage in an "entirely separate analysis" from the analysis required by the excessive force claim. 37 F. Supp. 3d at 682 (holding that plaintiff's breach of contract claims pertaining to loans made to defendant were not part of the same case or controversy as plaintiff's copyright claims because they will "require consideration of an entirely different set of facts").

Plaintiff argues that the claims share a common nucleus of fact because they will depend on a "substantial overlap in evidence"—in particular, plaintiff's testimony and medical records. Pl.'s Opp'n 12. Because evidence of plaintiff's hand injury will be introduced to prove the

excessive force claim, I agree that plaintiff's medical records may be relevant to both claims. However, the two claims rely on entirely different parts of those same records. Plaintiff's negligence claim will require the introduction of records that pertain to plaintiff's mental health evaluation and mental health history; the only medical records that are relevant to the excessive force claim, in contrast, are those that establish the nature of plaintiff's hand injury. The evidentiary overlap between these two claims can hardly be considered "substantial." Instead, it is incidental at most, and entirely unlike the circumstances of *BLT Restaurant Group*, a case cited by plaintiff. In *BLT Restaurant Group*, plaintiff's federal and state-law claims both required plaintiff to introduce into evidence restaurant menus, explanations of the terminology used in the menus, and information regarding plaintiff's pricing structure and recipes. *BLT Rest. Grp. LLC*, 855 F. Supp. 2d at 11. Given the significant overlap in evidentiary requirements, the court found that that the two claims were so connected that "it is to be expected that the entire context of the parties' original relationship and the events leading to, and following, the breach would be offered in evidence" for both claims. *Id.* at 11. Here, in contrast, there is at most a tenuous connection between the care needed to treat plaintiff's longstanding psychiatric illness and the alleged use of excessive force during his arrest. If each claim was brought separately, plaintiff would not be expected to introduce evidence that bore on the other claim.

Plaintiff also argues that the court should retain jurisdiction because of policy concerns—specifically, that retention of jurisdiction will "serve[] the interests of judicial economy, convenience, and fairness to the plaintiff." Pl.'s Opp'n 12. I am sympathetic to these arguments, and I would find them persuasive if the exercise of jurisdiction were a matter of discretion. But, in this case, it is not; as the Second Circuit has made clear, the exercise of jurisdiction *requires*—as an irreducible minimum—that the two claims share "a common nucleus of operative fact." *Lussier*,

211 F.3d at 704. *Tejada v. LittleCity Realty LLC*, a case upon which plaintiff relies, is not to the contrary, as the court in that case considered policy concerns—including fairness to the plaintiff—only after finding that plaintiff's city overcharge and federal discrimination claims shared a "common nucleus of underlying facts," such that evidence of one claim would be relevant to the other. 308 F. Supp.3d 724, 732 (2018). Here, where the two claims are not part of the same "case or controversy," the court is not permitted to "reach out for . . . issues, thereby depriving state courts of opportunities to develop and apply state law," *Young v. N.Y.C. Transit Auth.*, 903 F.2d 146, 164 (2d Cir. 1990) (quoting *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 757 (2d Cir. 1986) (alteration in original))—even if doing so would be more efficient and would prevent hardship to the plaintiff.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted on plaintiff's failure to intervene claim, and plaintiff's negligence claim is dismissed for lack of supplemental jurisdiction. Additionally, because defendants' motion for summary judgment on the supervisory liability claim is uncontested by plaintiff, that claim is also dismissed, and Sergeant Bersch is dismissed as a defendant in the action. As neither party has moved for summary judgment on plaintiff's excessive force, assault, and battery claims, those claims remain in the case, and the court continues to retain jurisdiction over them.

So ordered.

Date:   November 28, 2018
        Brooklyn, New York

                                        _____
                                                /s/
                                        Allyne R. Ross
                                        United States District Judge